# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIM. ACTION 08-0256-WS |
| | ) |
| TASHA MICHELLE BLACKBURN, | ) |
| | ) |
| Defendant. | ) |

# ORDER

This matter is before the Court on the defendant's motion for reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). (Doc. 297).

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that … extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission ….

18 U.S.C. § 3582(c)(1)(A).

Relief under this provision, known as "compassionate release," thus requires satisfaction of four elements: (1) a proper motion; (2) a finding that extraordinary and compelling reasons for such relief exist; (3) a finding of consistency with Sentencing Commission policy statements; and (4) favorable consideration of the Section 3553(a) factors.

The defendant has submitted no documentation indicating she has made a request to the warden of her facility for compassionate release. The Court therefore cannot find that she has satisfied the first requirement for relief.

Congress delegated to the Sentencing Commission the task of "describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction,

including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The Sentencing Commission has done so. U.S.S.G. § 1B1.13. The extraordinary and compelling reasons listed therein are the only ones that can support compassionate release, and district courts lack power to develop others. *United States v. Bryant*, 996 F.3d 1243, 1247-48, 1264-65 (11th Cir. 2021).

The November 2023 amendments to the guidelines added as an extraordinary and compelling reason for a sentence reduction the following:

> UNUSUALLY LONG SENTENCE. – If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

U.S.S.G. § 1B1.13(b)(6). The defendant's motion is predicated on this amendment. (Doc. 297 at 3).

The defendant received a sentence of 300 months, which the Court assumes for argument may constitute an "unusually long sentence." The defendant was sentenced in August 2009 and so has served more than ten years of her sentence. However, the defendant cannot satisfy the other elements of subsection (b)(6).

The defendant was convicted on a single count of conspiracy to unlawfully possess with intent to distribute more than 50 grams of a mixture containing a detectable amount of methamphetamine. (Doc. 1 at 1-2; Doc. 110-1). According to the presentence report ("PSR"), the vast majority of the substance involved in the conspiracy was ice – almost seven kilograms distributed by the two defendants themselves and another 17 kilograms distributed by other members of the conspiracy. (Doc. 136 at 9-10). The massive amount of ice involved in the conspiracy drove a base offense level of 38. (*Id*. at 11). With a total offense level of 40 and a criminal history category of I, the defendant's guideline range was 292 to 365 months. (*Id*. at 12, 14, 18). The Court at sentencing overruled the defendant's objections to the quantity of meth involved and adopted the PSR as published. (Doc. 184-4 at 12, 32). The defendant received a sentence of 300 months. (Doc. 143 at 2).

The sentencing guidelines, in 2008 and today, define "ice" as "a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." U.S.S.G. § 2D1.1(c), note (C). The guidelines, in 2008 and today, define "methamphetamine (actual)" as "the weight of the controlled substance, itself, contained in the mixture or substance." *Id.*, note (B).[1] Both in 2008 and today, the weight needed to trigger any given offense level is ten times more for a mixture containing a detectable amount of methamphetamine ("methamphetamine (mixture)") than it is for either ice or methamphetamine (actual). Thus, for example, under the 2023 guidelines, a base offense level of 16 is triggered by 10-20 grams of methamphetamine (mixture) but by only 1-2 grams of ice or methamphetamine (actual).

The defendant's motion rests on the decision of several sister district courts that, in fashioning a sentence, have rejected this 10:1 ratio on various related grounds. *See, e.g., United States v. Robinson*, 2022 WL 17904534 (S.D. Miss. 2022) (citing cases). The defendant assumes that, were it not for the ten-fold multiplier, her base offense level, her guideline range, and her sentence would have been lower.

The threshold difficulty with the defendant's position is that she has identified no post-sentencing "change in the law" for purposes of subsection (b)(6). Neither Congress nor the courts have invalidated the guidelines' disparate treatment of various forms of methamphetamine. Nor has the Sentencing Commission, much less by retroactive amendment. All that has occurred is that some lower courts have declined to follow the unchanged guideline. That is not a change in the law but at most a non-precedential change in some judges' application of it.

Nor does this phenomenon spring from any post-sentencing change in the law concerning federal courts' authority to deviate from the guidelines. As noted, the defendant was sentenced in August 2008. The guidelines have been recognized as advisory rather than mandatory since 2005, when the Supreme Court handed down *United States v. Booker*, 543 U.S. 220 (2005). Moreover, the Supreme Court in 2007 "allow[ed] a district court to vary from the guidelines based solely on its judgment that the policies behind the guidelines are wrong." *United States v. Irey*, 612 F.3d 1160, 1212

---

[1] Thus, for example, 100 grams of a mixture of 50% purity contains 50 grams of methamphetamine (actual).

3

(11th Cir. 2010) (en banc) (describing *Kimbrough v. United States*, 552 U.S. 85, 109 (2007), which addressed the guidelines' 100:1 crack cocaine – powder cocaine ratio).

Even did a sentencing court's ability to disagree with the guidelines' 10:1 ratio constitute a "change in the law" for purposes of subsection (b)(6), that change would not "produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed." As noted, the defendant was held accountable for 24 kilograms of ice. Under the drug quantity table in effect at the time of sentencing, 1.5 kilograms or more of ice carried a base offense level of 38. U.S.S.G. 2.D1(c)(1). Under the same table, 15 kilograms or more of methamphetamine (mixture) carried a base offense level of 38 – the same base offense level the defendant received. Therefore, were the Court to reject the 10:1 ratio, the defendant's guideline range, and her sentence, would remain exactly the same as she received. There is thus no disparity at all between the sentence the defendant received and the sentence she would have received under her scenario – much less the "gross disparity" required by subsection (b)(6).[2]

Even could the defendant show that a sentence not based on the 10:1 ratio would be lower than the sentence she received, she cannot show that "the sentence likely to be imposed" would be lower, because she has not persuaded the Court that it should exercise its authority (which it also possessed at the time of sentencing) to reject the 10:1 ratio.

The *Robinson* Court identified the rationale underlying the 10:1 ratio as a correlation between drug purity and the defendant's level in the distribution hierarchy. For this proposition, it relied (as have other courts) on application note 27(C) to Section 2D1.1. Note 27(C) addresses the possibility of upward departures in individual cases based on unusually high purity, "because it is probative of the defendant's role or position in the chain of distribution," since drugs "are often diluted … as they pass down the chain of distribution." The *Robinson* Court (and others) have concluded that, because most methamphetamine seized is now of extremely high purity (well above 90%)

---

[2] Under the current guidelines, 24 kilograms of methamphetamine (mixture) would carry a base offense level of 36 rather than 38. However, because this is the result of a non-retroactive guideline amendment, the Court is forbidden to consider it in determining whether subsection (b)(6) is satisfied. U.S.S.G. § 1B1.13(c).

4

regardless of level of distribution, any past correlation between purity and hierarchical rank has disappeared.  2022 WL 17904534 at *2-3.

By its express terms, note 27(C) does not apply to methamphetamine, because "the guideline itself provides for the consideration of purity."  It is therefore not clear that the 10:1 ratio for methamphetamine derives even in part from a perceived correlation between purity and organizational status.  In any event, other rationales plainly support the ratio.

No one denies that methamphetamine is a dangerous, addictive drug.  *See, e.g., United States v. Guajardo*, 726 Fed. Appx. 768, 770 (11th Cir. 2018) (sentencing court had discretion to consider "the dangerous and addictive nature of methamphetamines").  As the Court observed at the sentencing of the defendant's co-defendant, "I've been doing this long enough to see what methamphetamine has done to this community and how powerful a drug it is and how destructive it is and how it kills everything in its path …. [I]t's the most destructive drug I've ever seen."  (Doc. 180-3 at 9).  The more meth involved, the greater the destructive impact.  The purer the substance, the greater the destructive impact by weight.  The 10:1 ratio honors this straightforward reality.

Imagine three bags of meth, each weighing 100 grams.  The first bag is 10% pure, the second is 40% pure, and the third is ice (80%-99% pure).  This means the first bag contains 10 grams of actual meth, the second contains 40 grams of actual meth, and the third contains 80-99 grams of actual meth.  The second bag has more destructive potential than the first, and the third has more destructive potential than the other two combined.  The guidelines properly treat these different scenarios differently.  A defendant accountable for the first bag receives a base offense level of 24, while a defendant accountable for the second bag has a base offense level of 28, and a defendant accountable for the third bag receives a base offense level of 30.  This is a perfectly reasonable distribution of different consequences for different degrees of wrongdoing; it is the defendant's demand to treat these three very different hypothetical defendants identically, simply because their bags weigh the same, that strains reason.  It is as if the defendant were to say that a glass of pure grain alcohol (95% alcohol) is no more intoxicating than a glass of table wine (14% alcohol) simply because they both contain six ounces of an alcoholic beverage.

Appellate courts appear uniformly to have upheld sentencing courts that have refused to reject the 10:1 ratio. As the Fourth Circuit says, "just because you can [reject the ratio] does not mean you must." *United States v. Williams*, 19 F.4th 374, 378 (4th Cir. 2021). The lower court in *Williams* did not abuse its discretion in applying the ratio "because of the vastness of this conspiracy and the danger posed by Ice and the appropriateness of treating higher purity methamphetamine more seriously than lower purity methamphetamine." *Id*. As the sentencing court in *Williams* ruled, "[i]t is … not inappropriate for the Sentencing Guidelines to treat higher purity methamphetamine more seriously, in light of its increased popularity, its more profound effect on the user, and its connection with international crime syndicates." *United States v. Farris*, 421 F Supp. 3d 321, 330 (W.D. Va. 2019).

The Seventh Circuit has held that the 10:1 ratio is sustainable even if there is no correlation between purity and organizational level. *United States v. Bostock*, 910 F.3d 348, 351 (7th Cir. 2018). Without identifying all the other justifications for the disparity, the Court recognized that "60 grams of a substance that can be cut to produce 500 grams of 10% methamphetamine is worth more than 60 grams of 10% methamphetamine." *Id*. And the Sixth Circuit has upheld a sentencing court's refusal to reject the 10:1 ratio on the grounds that "actual methamphetamine is substantially more addictive." *United States v. Alonzo*, 811 Fed. Appx. 301, 306 (6th Cir. 2020).

*Robinson* is the only case cited by the defendant, and the Court has not *sua sponte* performed an exhaustive review of other cases rejecting the 10:1 ratio. The Court has, however, reviewed the cases cited by *Robinson*, and it respectfully reports that it finds in them no persuasive reason to reject the 10:1 ratio.

The Court in *United States v. Nawanna*, 321 F. Supp. 3d 943 (N.D. Iowa 2018), was troubled that, "because of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases …." *Id*. at 954. The *Nawanna* Court thought this "ma[de] the Guidelines purity enhancement excessive." *Id*. at 954. It appears the *Nawanna* Court believed that the guidelines regarding methamphetamine (mixture) represent the ordinary rule and that an enhanced offense level based on purity can only be an exception to the ordinary rule and cannot

predominate over the ordinary rule. The Court is aware of no legal principle that a higher penalty must be less common than a lower penalty, and applying such a concept here would run directly counter to the reasonable goal of punishing larger distributors more severely.

In a related vein, the *Nawanna* Court expressed support for quantity-based differences in defendants' guideline ranges while rejecting purity-based differences. 321 F. Supp. 3d at 954. As addressed above, this Court sees increased purity as entailing increased quantity of the actual harmful substance.

The Court in *United States v. Hartle*, 2017 WL 2608221 (D. Idaho 2017), was concerned that the 10:1 ratio "can have an arbitrary and unwarranted effect on the sentence imposed" based on whether or not the drug was tested for purity, with defendants accountable for identical amounts of methamphetamine (actual) receiving different base offense levels depending on whether a lab completed testing before sentencing. *Id*. at *1, *3. There are of course other ways to establish purity[3] but, in any event, the government's failure of proof in some cases does not make the 10:1 ratio arbitrary or unwarranted, any more than the government's failure of proof on any of the hundreds of matters that affect guideline calculations renders the guidelines suspect. Sentencing outcomes may be different, but defendants as to whom the purity of meth is known are not improperly disfavored; rather, defendants as to whom the purity of meth is not known receive a lucky break.[4]

The defendant in *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249 (D.N.M. 2017), "was a low level [one-time] courier who didn't even know what drug he was transporting" when he was caught with over two kilograms of 98% pure meth. *Id*. at 1250-51. The Court concluded that utilizing the base offense level for methamphetamine (actual) "would be unconnected to culpability" and that "mine-run" defendants should be

---

[3] In this case, purity was established primarily by the testimony of participants in the conspiracy. (Doc. 136 at 9-10).

[4] Given that *Hartle* and other courts understand that most meth is as pure as ice, it is the lower base offense levels for untested meth that are most open to question. *See Hartle*, 2017 WL 2608221 at *3 (because actual meth levels are uniformly much higher, "[s]imply put, the presumed purity of 10% for untested methamphetamine is no longer valid.").

sentenced consistently with the methamphetamine (mixture) guidelines, especially given (citing *Hartle*) the "arbitrary" happenstance of whether testing for purity is accomplished. *Id*. at 1256-57. There will of course be times when the guideline range – any guideline range – does not adequately fit the facts and circumstances of an individual case. That is what variances are for. The Court, however, disagrees with the assessment that, even though most defendants will be handling highly purified methamphetamine, with the magnified individual and societal damage that conduct causes, they should routinely be sentenced as though they were handling the same weight of highly diluted meth.

For the reasons set forth above, the Court declines to reject the guidelines' 10:1 ratio across the board. Even were the Court persuaded (which it is not) that the ratio is unsupportable at the lower end of the drug quantity table, where smaller amounts of controlled substances are involved and smaller fish may be caught in the net, the defendant's conduct falls at the extreme high end of the table. Excluding the rare dupe or simpleton as in *Ibarra-Sandoval*, it is difficult to imagine a defendant trafficking in kilos (not grams) of ice as to whom the guideline base offense level for ice is inappropriately high.

Subsection (b)(6) requires the Court to "full[y] conside[r] … the defendant's individualized circumstances" before determining whether a change in the law represents an extraordinary and compelling reason for a sentence reduction. Over the course of two years, the defendant and her co-defendant personally distributed seven kilograms of ice and were members of a conspiracy that distributed 24 kilos of ice – a staggering 16 times the threshold then in effect to receive a base offense level of 38. It borders on the absurd to suggest that such conduct should earn the defendant a volume discount. The defendant was not a dupe, or a simpleton, or a low-level courier; she was instead a substantial distributor, with drive a telemarketer would envy. As the Court recounted at the co-defendant's sentencing, "as soon as deliveries were made of these drugs, the Defendants were on the phone calling their friends and the people who would buy from them and selling these drugs and selling them quickly …. They were able to distribute drugs in minutes and hours and then be on the phone calling the supplier to get more drugs." (Doc. 180-3 at 10). Even if all other obstacles to the defendant's satisfaction of

subsection (b)(6) were removed, given her individualized circumstances, the Court would not find the existence of an extraordinary and compelling reason to reduce her sentence.

Because the defendant cannot satisfy the second requirement for compassionate relief, the Court pretermits discussion of the third and fourth requirements. *United States v. Giron*, 15 F.4th 1343, 1347, 1350 (11th Cir. 2021).

For the reasons set forth above, the defendant's motion for compassionate release is **denied**.

DONE and ORDERED this 26th day of March, 2024.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE